1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   ALFRED GONZALES AND,                     CASE NO. 10-cv-01010-LJO-BAM
     KELLY GONZALES, Individually
12   and on Behalf of All Others Similarly
     Situated,
13                     Plaintiffs,            **FINDINGS AND RECOMMENDATIONS ON
                                              PLAINTIFF'S MOTION FOR CLASS
14                                            CERTIFICATION;   APPOINTMENT   OF
                                              REPRESENTATIVE   PLAINTIFFS   AND
15                                            LEAD COUNSEL**

16   COMCAST CORPORATION, and
     DOES 1 through 10 Inclusive,
17
                       Defendants.
18   _____  /

19                              **I. INTRODUCTION**

20          By notice filed on August 22, 2011, plaintiffs Alfred Gonzales and Kelly Gonzales ("Plaintiffs")

21   filed a motion to certify two putative classes in this matter.  (Doc. 64.)  Defendant Comcast Corporation.

22   ("Comcast") filed an opposition on September 26, 2011.  (Doc. 75.)  Plaintiffs filed their Reply Brief

23   on October 14, 2011. (Doc. 78.)  The Court heard oral arguments on the matter on November 18, 2011.[1]

24   (Doc. 83.)  Having considered the moving, opposition and reply papers, the declarations and exhibits

25   attached thereto, arguments presented at the November 18, 2011 hearing, as well as the Court's file, the

26   Court issues the following findings and recommendations.

27   _____

28          [1] Counsel Kevin Ruf and Coby Turner appeared for Plaintiffs.  Counsel Bryan Merryman and Jaime Bianchi appeared for Comcast.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On May 3, 2010, Plaintiffs, individually and on behalf of all others similarly situated, filed a putative class action complaint against Comcast in the Superior Court of the State of California in and for the County of Fresno. (Doc. 1, Attach. 1., the "State Court Action")  On June 3, 2010, Comcast, pursuant to 28 U.S.C. §§ 1446(a) and (d), removed the State Court Action to this Court. (Doc. 1.)  On May 13, 2011, Plaintiffs filed a First Amended Complaint (Plaintiffs' "FAC"), which is the operative pleading underlying the instant Motion.  (Doc. 56.)

The crux of Plaintiffs' FAC, as well as their Motion for Class Certification**,** challenge Comcast's billing and service cancellation practices**.**  (Pls.' Mot. Class Cert., 1: 7-13, Doc. 64.)  Specifically, Plaintiffs challenge Comcast's policies and practices relating to post-cancellation billing of consumers who seek to "port"[2] their telephone number to another service provider. (Pls.' FAC ¶¶ 23-5, Doc. 56.)  Additionally, Plaintiffs allege that Comcast's policies and practices result in consumers receiving unclear and inaccurate billing statements.  (Pls.' FAC ¶¶ 22, 41, Doc. 56.)  Plaintiffs argue that Comcast "purposefully uses arcane and confusing final billing statements to prevent its customers from understanding its improper billing methods, such as billing past the last date of service, using inaccurate refund calculations, and delaying the last day of service past the customer's requested date in order to 'confirm' porting." (Pls.' Mot. Class Cert., 5: 3-8, Doc. 64.)

### A.    Comcast's Billing and Account Cancellation Model

According to Plaintiffs' FAC, Comcast is the largest cable provider in the United States and conducts a substantial amount of its business in the State of California. (Pls.' FAC ¶ 1, Doc. 56.)  When California consumers sign up for Comcast's services, they are required to enter into standard Residential Service Contracts.[3]  (Declaration of Kevin F. Ruf ("Ruf Decl."), Ex 14, 106: 19-22, Doc. 66.) When a consumer seeks to cancel their Comcast services, the Residential Service Contract provides that consumers are responsible for all applicable fees and charges until the Contract is terminated, service is disconnected and equipment is returned. (Declaration of Bryan A. Merryman ("Merryman Decl."),

---

[2]  "Porting" is the process by which an existing telephone number is reassigned to a new telephone service provider.

[3]  With the exception of references to new products and services, the evidence indicates that the Residential Service Contracts are standard documents tendered to all California consumers.  (Ruf Decl., Ex 14, 106: 19-22, Doc. 66.)

Ex. A at 11, Doc. 75.)

Comcast's billing model entails billing and collection of money in advance of Comcast's providing the services for which the customer is being billed. (Merryman Decl., Ex. T at 194-5, Doc. 75.) Because Comcast's services are billed in advance of their use - thus, often resulting in overpayments when consumers seek to cancel their Comcast account - Comcast has internal mechanisms in place for automatically generating prorated refunds to customers. (Merryman Decl., Ex. A at 11; Ex. Q at 141-44; Ex. T at 196-201; Doc. 75.)

If a Comcast customer includes a porting request when cancelling their Comcast service, Comcast does not close the customer's account until the porting has occurred. (Pls.' FAC, ¶ 23, Doc. 56; Merryman Decl., Ex. P at 138-140, Ex. T at 190-92, Doc. 75.) Accordingly, if a porting request is unresolved, even if a customer has returned Comcast's equipment and the agreed-upon cancellation date has passed, the customer will continue to be billed, because it is Comcast's policy to leave customer accounts open until the port-out is confirmed. (Ruf Decl., Ex 14, 5: 17-23; Ex. 18, 5: 11-28, Doc. 66.)

**B.      Plaintiffs Alfred Gonzales' and Kelly Gonzales' Experience With Comcast**

In or around November of 2004, Plaintiffs contracted with Comcast to provide various communication and entertainment services in their home. (Ruf Decl., Ex. 24, ¶ 4, Doc. 66.) When Plaintiffs signed up for Comcast's services, they received a Residential Services Contract (the "Contract") which provided, *inter alia,* that Plaintiffs would be responsible for all applicable fees and charges until the Contract was terminated, services were disconnected and equipment was returned. (Ruf. Decl., Ex. 24, ¶ 4, Doc. 66; Merryman Decl., Ex. A at 11, Doc. 75.) The Contract further provided that Comcast would refund all prepaid monthly service fees charged for Comcast's services after the date of termination. (Merryman Decl., Ex. A at 11, Doc. 75.)

Sometime in 2008, Plaintiffs signed up for a service provided by Comcast called "Pay Direct," which permits Comcast's customers to establish automatic recurring payments, debited from the consumer's checking account, in making their monthly payments to Comcast. (Ruf Decl., Ex. 24 ¶ 5, Doc. 66.) The Pay Direct Agreement provides that in order to cancel the Pay Direct service or otherwise cancel the automatic billing, the customer was to give notice to Comcast – either in writing,  by telephone or internet.  (Merryman Decl., Ex. B at 38-44, Doc. 75.)

1    Sometime between October 8, 2008 and November 6, 2008, Plaintiffs contacted Comcast to

2    cancel their Comcast services,[4] establishing an effective cancellation date of November 6, 2008.[5](FAC,

3    ¶12, Doc. 56; Ruf Decl., Ex. 24 ¶ 7, Doc. 66.)  Plaintiffs additionally requested that their telephone

4    number be released for porting to a new service provider. (Merryman Decl., Ex. S at 171, Doc. 75.)  At

5    this time, Plaintiffs did not separately terminate the Direct Pay Agreement.[6] (Merryman Decl., Ex. S at

6    169-70; Ex. B at 38-44, 56-57, Doc. 75.)  On November 4, 2008, an automatic payment of $174.46 was

7    debited from Plaintiffs' checking account, representing payment for Comcast's services for the billing

8    period of October 19, 2008 to November 18, 2008.  (FAC ¶ 13, Doc. 56; Merryman Decl., Ex. E, Doc.

9    75.)

10    On November 7, 2008, Plaintiffs returned all Comcast equipment to a Comcast retail store, and

11    Plaintiffs were given a receipt after returning the equipment.[7]  (FAC ¶ 12, Doc. 56; Ruf Decl. Ex. 24 ¶

12    8, Doc. 66; Merryman Decl., Ex. F at 83, Doc. 75.)  At this time, Plaintiffs' Account remained open

13    because Comcast's records indicated the requested porting had not been completed.  (Comcast's Op.,

14    4: 13-15; Merryman Decl., Ex T at 201-02, Doc. 75.)   Because Plaintiffs' account remained open,

15    Plaintiffs' checking account was debited on December 4, 2008, in the amount of $174.46, representing

16    the billing period of November 19, 2008 to December 18, 2008. (Comcast's Op., 4: 18-20, Doc. 75; FAC

17    ¶16, Doc. 56.)   Plaintiffs' Account continued to remain open and generate billing statements until at

18    least January 9, 2009, when Plaintiffs received a bill for $351.88.[8] (Ruf Decl., Ex. 24 ¶ 13, Doc. 66.)

---

[4]  Plaintiffs state they unsuccessfully attempted to cancel their Comcast services on or about September 22, 2008.
(FAC, ¶12, Doc. 56; Ruf Decl., Ex. 24 ¶ 6, Doc. 66.)  However, this allegation does not factor into Plaintiffs' theory of
liability and, as such, the Court beings its analysis with the Plaintiffs' second attempt to cancel their Comcast services.

[5]  The parties disagree on what the agreed-upon termination date was, as Comcast contends the termination date was
November 7, 2008. (Comcast Op., 4: 10-11.) This disagreement is not critical to the Court's analysis for this Motion.

[6]  Ultimately, Plaintiff did not cancel their Pay Direct Authorization until sometime in December 15, 2008.  Doc.
66, Ex. 24 ¶ 12; Doc. 75, 4: 23-4.

[7]  The Parties dispute whether this receipt was a billing statement on the account, or a receipt solely for the return
of the equipment. *Compare* Doc. 66, 4: 3-10 *with*; Doc 75, 4: 10-12.  This disagreement is not critical to the Court's analysis
for this Motion.

[8]  These statements, however, reflected an account receivable, rather than a debit from Plaintiffs' checking account,
as Plaintiffs had withdrawn their Direct Pay Authorization on or about December 15, 2008.

On April 27, 2009, Plaintiffs received a check from Comcast in the amount of $241.23, representing a refund of funds deducted from Plaintiffs' checking account via Direct Pay on November 3, 2008 and December 4, 2008; less a prorated portion for services rendered between October 19, 2008 and November 7, 2008.[9]  (FAC ¶ 19, Doc. 56; Ruf Decl., Ex. 24 ¶ 15, Doc. 66; Comcast's Op., 4: 26-28, Doc. 75.)  In or around October of 2010, Plaintiffs re-subscribed to Comcast's services. (Comcast's Op., 2: 7-8, Doc. 75.)

## C.    Plaintiffs' FAC

Plaintiffs' FAC states claims against Comcast on behalf of two proposed Classes for: (1) violations of the Unfair Competition Law, Cal. Bus. &  Prof. Code § 17200 *et seq.* (the "UCL")*;* (2) violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* (the "CLRA"); and (3) breach of contract.  (Pls.' FAC ¶¶ 39- 58, Doc. 56.)

Plaintiffs plead a claim against Comcast under the Section 1770(a)(5) CLRA, arguing that Comcast's porting and billing practices are tantamount to "a representation that [Comcast's] goods or services have characteristics, uses and benefits which they did not have." Cal. Civ. Code § 1770(a)(5). Plaintiffs state two separate claims under the UCL: a claim for "unlawful" business practices and a claim for "unfair" business practices.  Plaintiffs' claim for unlawful business practices under the UCL is predicated on an alleged violation of Video Customer Service Act, Cal. Govt. Code § 53088 *et seq.* (the "Video Act"). Specifically, Plaintiffs allege Comcast has violated Section 53088.2(f) of the Video Act by failing to render bills that are accurate and understandable.  Plaintiffs also plead an "unfair" business practice claim under the UCL for Comcast's practice of leaving customer accounts open until porting has been confirmed, and for Comcast's use of inaccurate and unclear billing statements. Plaintiffs allege an additional unlawful UCL claim predicated on the above-referenced CLRA claim. Lastly, Plaintiffs plead a claim for breach of contract,[10] arguing that Comcast has "charged Plaintiffs and Class Members for more fees than were permitted under the Service Contract."

---

[9]  The Parties dispute whether the April 27 refund was a full refund of monies due to Plaintiff from the period of November 7, 2008 through December 4, 2008. This issue is discussed in greater detail below.

[10]  It is unclear if Plaintiffs are attempting to assert their breach of contract claim on behalf of both Classes, or just the Porting Class.  However, because Plaintiffs have stated this claim applies "when customers' accounts were kept open without their knowledge or consent[,]" it would appear this claim only applies to the Porting Class.

**D.      Plaintiffs' Motion For Class Certification**

Plaintiff seeks to certify the following classes:

1)      The "Cancellation Class" comprising all Comcast customers in California, who, from May 3, 2006 to the present, cancelled their Comcast services and returned their Comcast equipment but were not given an accurate billing statement upon termination that clearly stated the date of account termination, the last day of service charges incurred and/or the correct final billing credit amount [and;]

2)      The "Porting Class" comprising all Comcast customers in California, who, from May 3, 2006 to the present, cancelled their Comcast services and returned their Comcast equipment, but whose accounts were not closed at that time.

Plaintiffs seek certification for both the Cancellation Class and the Porting Class ("collectively referred to as the "Classes") pursuant to Rule 23(b)(2) and 23(b)(3).[11]  Plaintiffs' Motion for Class Certification also seeks to appoint Plaintiffs as class representatives and appointment of Plaintiffs' counsel, Glancy Binkow & Goldberg LLP, as lead counsel for the Classes.  Additionally, Plaintiffs seek to assert claims for breach of contract and violations of the UCL and CLRA on behalf of both Classes.

## IV.  DISCUSSION

**A.      Standing**

Before considering whether Plaintiffs' proposed Classes meet the requirements of Rule 23, the Court must determine whether Plaintiffs' have standing to assert their claims. In class actions, questions of standing do not generally defer until the class certification stage. *LaDuke v. Nelson,* 762 F.2d 1318, 1325 (9th Cir. 1985) ("Standing ... is a jurisdictional element that must be satisfied prior to class certification.")  It is proper for the Court to address the issue of standing before addressing the issue of class certification. *See Easter v. Am. West Fin*., 381 F.3d 948, 962 (9th Cir.2004).

**1.      Standing Requirements**

Under Article III's standing requirement, a plaintiff must have suffered an "injury in fact" that is "distinct and palpable," the injury must be fairly traceable to the challenged action, and the injury must be likely redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In other words, the alleged injury can not be "abstract . . . conjectural or hypothetical." *Whitmore v. Arkansas*, 495 U.S. 149, 155–56, 110 S.Ct. 1717, 109

---

[11] While Plaintiff's Notice of Motion and Motion for Class Certification only requests certification pursuant to Rule 23(b)(3), Plaintiffs' Memorandum of Points and Authorities, as well as Plaintiffs' arguments presented at the November 18 hearing, requested certification under to Rule 23(b)(2). Accordingly, the Court will discuss whether certification is appropriate under both standards.

L.Ed.2d 135 (1990) (internal quotation marks omitted). "[T]he Supreme Court's precedent may be read to support a general rule of standing along these lines: If the injury is not concrete, there is no injury in fact even if the injury is particularized[.]" *Covington v. Jefferson County,* 358 F.3d 626 (9th Cir. 2003).

To confer standing under the UCL, as well as to serve as a class representative, plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp., v. Superior Court,* 51 Cal. 4th 310, 322 (Cal. 2011); Cal. Bus. & Prof. Code 17204.  Under the CLRA, Plaintiff must show a tangible increased cost or burden resulting from an alleged unlawful practice.  Cal. Civ. Code § 1780(a); *Meyer v. Sprint Spectrum L.P.,* 45 Cal. 4th 634, 643 (Cal. 2009).

### 2.      Plaintiffs Bear The Burden of Demonstrating Standing

Comcast argues that under Article III, the UCL and CLRA,  Plaintiffs' lack standing to represent the proposed Classes.  (Comcast's Op. 7-9. Doc. 75.)  Specifically, Comcast argues that because Plaintiffs received a full refund for any over-billing that took place, Plaintiffs have not suffered the requisite "injury in fact" required under Article III and Plaintiffs' substantive claims. *Id.* In response, Plaintiffs argue that "Defendant has not presented any evidence to show that Plaintiffs have been fully refunded[,]" and that "[i]n the absence of any evidence proving that Plaintiffs do not have standing, [i.e., received a full refund] the well pled allegations in the Complaint should be taken as true at the class certification stage."  (Pls.' Reply, 4: 6-14, Doc. 78.)  Plaintiffs additionally argue they have suffered an economic injury resulting from overdraft fees imposed by Plaintiffs' bank as a result of Comcast's improper billing. (Pls.' Reply, 3: 22-25, Doc. 78).

Plaintiffs argue it is Comcast's burden to demonstrate Plaintiffs lack standing.  Specifically, Plaintiffs argue that "[i]n the absence of any evidence proving that Plaintiffs do not have standing, the well pled allegations in the Complaint should be taken as true at the class certification stage." (Pls.' Reply, 4: 6-14, Doc. 78.)  The Court disagrees.  It is not Comcast's burden to prove Plaintiffs lack standing.  On the contrary, it is axiomatic that Plaintiffs bear the burden of demonstrating their own standing. *See United States v, Hayes,* 515 U.S. 737, 743 (1995) (the burden is on plaintiff "to

7

allege facts demonstrating that [plaintiff] is a proper party to invoke judicial resolution of the

dispute."); *Friendly House v. Napolitano*, 419 F.3d 930, 932 (9th Cir. 2005)("Plaintiffs have not met

*their* burden of demonstrating an injury-in-fact.") (emphasis added); *Caldwell v. Caldwell,* 420 F.

Supp. 2d 1102, 1105 (N.D. Cal. 2006) ("Plaintiff also bears the burden of demonstrating that she has

standing to pursue the claims alleged in the complaint.").   Plaintiffs' standing, therefore, can not be

presumed by the Court.  Rather, Plaintiffs are required to put forward evidence demonstrating

Plaintiffs *in fact* have legal standing to pursue the claims alleged in their complaint.

### 3.   Plaintiffs' Individual Standing

#### i.   Speculative Nature of Injury In Fact Resulting From Inadequate Refund

Plaintiffs have failed to establish an injury in fact or economic loss sufficient to confer

standing under Article III, the UCL or the CLRA. With respect to Plaintiffs' claims of inadequate

refunds, the Court finds Plaintiffs' claim that the refund provided by Comcast was inadequate is too

speculative to plead a concrete injury in fact. *See Bernhardt v. County of Los Angeles*, 279 F.3d 862,

872 (9th Cir. 2002) ("a claim for damages that is too speculative in some circumstances precludes

standing.").

The Court disagrees with Plaintiffs that "Defendant has not presented any evidence to show

that Plaintiffs have been fully refunded."  (Pls.' Reply, 4: 6-14, Doc. 78.)  The undisputed evidence

before the Court demonstrates that Comcast provided a prorated refund for money debited from

Plaintiffs' bank account in November and December of 2008 – the time frame Comcast is alleged to

have improperly take money from Plaintiffs' account. (FAC ¶ 19, Doc. 56; Ruf Decl., Ex. 24 ¶ 15,

Doc. 66; Comcast's Op., 4: 26-28, Doc. 75.)  In response, Plaintiffs claim that the prorated refund

was less than what Plaintiffs were entitled to receive.  However, Plaintiffs have failed to

demonstrate, or even allege with any degree of concreteness, that the refund was inadequate. Indeed,

Plaintiffs' FAC acknowledges that Comcast tendered a refund to Plaintiffs, and that "it has been

virtually impossible to determine what Plaintiffs were billed for and whether their refund check

compensates them for the improper charges they incurred."  (FAC ¶ 20, Doc. 56.)  Nowhere in the

FAC does Plaintiffs actually allege the refund was inadequate.

Looking to the evidence before the Court, Plaintiffs' evidence that the refund was inadequate

is highly speculative.   First, Plaintiffs have failed to present non-speculative evidence regarding *how* Comcast calculates its refunds.[12]  Rather, Plaintiffs - without the aid of experts and without any reference to Comcast's specific billing or refund practices - have devised a series of rudimentary and varying calculations based on seemingly indiscernible and ever-changing variables.  The damages resulting from these varying calculations run the gamut of possibilities - anywhere from around five cents to upwards of $106.69[13] for the same period.[14]  The deposition of Mrs. Gonzales demonstrates the speculative nature of Plaintiff's inadequate refund claims:

> So there's so many different ways this [the refund calculation] can be done.  I know it's crazy.... (Gonzales Depo., 232: 18-19.)

> ...there would be more days from October 19th, '08 to November 18th, 08' than there would be in November 19th, '08 to December 18th, '08 . . . . (Gonzales Depo., 228: 1-6.)

> And the November statement, the November 9th statement is actually billed for 30 days, so if you look, they are charging me for the same amount on both statements, though one is 31 days and one is 30 days, so it's really hard to come up with a figure because if you take 174.46, this is just, it's crazy and confusing, I know, but bear with me.  If you take 174.46 and you divide that by 31, well, now you get 5.63 a day.  I

---

[12] At oral argument, Plaintiffs acknowledged they had failed to determine how Comcast calculated its refunds with respect to Plaintiff or the putative Class Members.

[13] Plaintiffs' estimate that the damages could be as high as $106.69 can be rejected on its face as this calculation simply argues that Plaintiffs should be entitled to an entire refund of the November 4, 2008 debit in the amount of $174.46. Because this debit covered the billing period from October 18, 2008 to November 19, 2008, and because the agreed-upon cancellation date was November 7, 2008, it is clear Plaintiffs were not entitled to a full refund of the November 4, 2008 debit. Plaintiffs would have had to pay for Comcast's services between October 18, 2008 and November 7, 2008.

[14] For example, in Plaintiffs' Motion for Class Certification, Plaintiffs state that the refund *may* have been calculated at a rate of $2.0952 per day, when in fact, Plaintiffs argue, the daily refund figure should have been 2.0964 per day – resulting in damages of twelve-one-hundredths of a cent per day.  (Pls. Mot. Class Cert. 6, n. 13.) At this rate, Plaintiffs' total damages would be approximately five cents.  In that same footnote, Plaintiffs suggest another calculation that would bring Plaintiffs' damages claim to $1.64.  *Id.*  In response to written discovery from Comcast, Plaintiffs responded that "Plaintiffs[,] based on their personal calculations, believe the amount of damages suffered . . . are in the range of $20 to $90."  (Deposition of Kelly Gonzales, 246: 1-9.) In that same deposition, however, Mrs. Gonzales stated that she felt the refund check should have been $348.92, which would have resulted in a total damage claim of $106.69.  (Gonzales Depo., 138: 1-8.)

know, crazy, but if you take the 174.46 and you divide that by 30 days, which the November statement would be for, let's go for that now. Oh, pardon me. Divided by 30 days.  Now that's 5.82 per day. So I'm not really sure what they charge.  Is it 5.82 per day? Is it 5.63 a day?  Because they are both different amounts and look at two different things.  It's really hard.  It's really confusing.  I don't know.... (Gonzales Depo., 233: 4-19.)

But I would also have to say something else.  Now, how are taxes done? Because, you know, if you are saying it's that much per day, well, are taxes charged per day? Are they charged per month? Because you have all these one-time charges, franchise fees, sales tax, FCC user fee, you have paid capital fee.  So if we're including those and dividing, are those consistent things, or are we dividing them out? (Gonzales Depo., 234: 16-25.)


[Counsel reading an interrogatory response from Plaintiffs into the deposition record:] However, Plaintiffs are unsure of the per diem charge of Comcast services since it's not delineated in the billing statements and are also unsure of which day billing ended.  And in absence of this information from Comcast, Plaintiffs cannot formulate a precise answer to this interrogatory.  Plaintiffs[,] based on their personal calculations, believe the amount of damages suffered, even discounting Comcast's eventual refund, are in the range of $20 to $90. (Gonzales Depo., 246: 1-9.)

Even now, at the class certification stage, Plaintiffs can not explain what their damages are, and the justification for claiming those damages. Plaintiffs' Motion argues that the total refund calculation resulted in damages to Plaintiffs anywhere from five cents to $1.64, but as Plaintiffs' deposition indicates, these calculations fail to consider the many possible variables that could have gone into Comcast's refund calculation. Plaintiffs have failed to identify how Comcast incorporates these many variables into its refund calculation; a problem which would apply equally to the Class members. Considering the de minimis amount Plaintiffs allege, coupled with Plaintiffs' failure to present a reasonable basis for claiming these minimal damages, the Court does not find Plaintiffs have concretely alleged an injury in fact relating to inadequate refunds.  Rather, the present claim

"rests at the bottom on some abstract conception or speculative measure of harm." *Associated General,* 459 U.S. at 543.[15]

### ii. Injury In Fact Resulting From Bank Overdraw Fees

Plaintiffs have additionally argued they suffered an injury in fact in the form of overdraft fees imposed by Plaintiffs' bank when Comcast impermissibly withdrew funds from Plaintiff's checking account. (Pls. Reply, 3: 21-25, Doc. 78.). The Court believes this alleged injury sufficiently establishes a concrete injury of fact. *See Steele v. Hospital Corp. of America*, 36 F.3d 69, 71 (9th Cir.1994) (allegations of a "concrete financial loss" suffice to confer standing). Overdraft fees, if caused by Comcast's conduct, constitute a "concrete financial loss." This injury in fact stems from the same conduct of Comcast alleged to have caused the inadequate refunds. The overdraft injury sufficiently confers standing on Plaintiffs under Article III, the UCL and CLRA.[16]

### 4. Absent Class Member's Have Not Suffered An Injury In Fact Resulting From Inadequate Refunds

Putative class members need not submit evidence of personal standing, however, a class must be defined in such a way that anyone within it would have standing. *Wal-Mart Stores, Inc. V. Dukes,* --- U.S--- ,131 S.Ct. 2541, 2552 (2011) ("*Dukes*") (acknowledging the need to exclude putative class members seeking injunctive relief who were no longer employed by Wal-Mart because those absent class members "lack[ed] standing to seek injunctive or declaratory relief against [Wal-Mart's current] employment practices."); *Amchem Prods., Inc., v. Windsor,* 521 U.S. 591, 612-13 (1997) (instructing district courts to be "mindful that Rule 23's requirements must be interpreted in keeping with Article III constraints."); *Denney v. Deutsche Bank AG,* 443 F.3d 253, 264 (2d Cir.2006) ("[N]o class may be certified that contains members lacking Article III standing."); *Burdick v. Union Sec.*

---

[15] Under Rule 23, the Court is to conduct a "rigorous analysis." *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 980 (9th Cir. 2011). The Court has found Plaintiffs lack standing for failure to show an injury in fact with respect to inadequate refunds. Nonetheless, the Court conducts the proceeding Rule 23 analysis as though Plaintiffs had sufficiently stated an inadequate refund injury in fact for standing purposes.

[16] Nonetheless, the overdraft injury is not typical of the injuries alleged on behalf of the Class members. Additionally, there is no evidence indicating the determination of this type of injury could be ascertained on a common class-wide basis.

*Ins. Co.,* No. 07-cv-4028 - ABC (JCX), 2009 WL 4798873, at *4 (C.D. Cal., Dec. 9, 2009) ("absent

class members lacking justiciable claims under Article III should be excised from the case.); *Sanders*

*v. Apple, Inc.,* 672 F.Supp. 2d 978, 991 (N.D. Cal. 2009); *O'shea v. Epson America, Inc.,* No. 09-cv-

8063-PSG (CWX), 2011 WL 4352458, at *8 (C.D. Cal., Sept. 19, 2011) ("*Tobacco II* does not

permit a federal class action to proceed where class members lack Article III standing"); *Aho v.*

*AmeriCredit Financial Services, Inc.,* No. 10-cv-1373 DMS, 2011 WL 3047677 (S.D. Cal., July 25,

2011) ("The requirement that all members of the class have Article III standing makes sense.  If that

were not the rule, a class could include members who could not themselves bring suit to recover,

thus permitting a windfall to those class members and allowing Rule 23 to enlarge substantive

rights.")

The evidence before the Court demonstrates that none of the putative Class members have

suffered an injury in fact. As discussed above, to establish standing under Article III, the UCL or the

CLRA, Plaintiffs must establish not just a wrongful act prohibited by those statutes, but Plaintiffs

must also show that those wrongful acts resulted in an injury to Plaintiffs and the putative Class

members.  In other words, it is insufficient, for standing purposes, to allege that Comcast's billing

statements violate the Video Act, or that Comcast's porting practices violate the UCL or CLRA.

Injuries must also flow from these wrongful acts.

Plaintiffs claim that Comcast's cancellation and porting practices result in over-billing to

Comcast customers.  This is the sole injury alleged on behalf of the Classes.  Comcast, however, has

put forward evidence that Comcast maintains internal mechanisms for automatically generating

refunds.  Indeed, Plaintiffs received such a refund.  Plaintiffs have not presented any evidence

indicating that Comcast fails to generate these refunds. On the contrary, because Comcast bills for its

services in advance, automatically generating refunds would seem to be a fundamental aspect of

Comcast's business model.  In response, Plaintiffs argue these refunds are inadequate due to

incorrect refund calculations.  As discussed above, however, *see supra* Section IV.A.3.i, Plaintiffs

have failed to present any non-speculative evidence that the refund calculation is incorrect or

otherwise results in an injury to Plaintiffs or the absent Class members.

For the same reasons that Plaintiffs have failed to establish an injury in fact relating to their

own refund, Plaintiffs have similarly failed to put forward any evidence that absent Class members have suffered any injury resulting from Comcast's alleged unlawful conduct.  In other words, even assuming Comcast's billing, cancellation and porting practices violate the Video Act, UCL, CLRA and the terms of Comcast's Service Agreement, Plaintiffs have not presented any evidence indicating that any of the putative Class members have suffered an injury as a result of these practices. As a result, neither Plaintiffs nor the absent members of the Cancellation or Porting Classes have standing to assert the claims alleged in Plaintiffs' First Amended Complaint.

**B.      Rule 23 Certification Analysis**

The Court has found Plaintiffs failed to show they have standing.  Nonetheless, even if Plaintiffs could demonstrate standing, certification of the Classes would fail.

**1.       Legal Standard**

A class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition to the requirements imposed by Rule 23(a), Plaintiffs bear the burden of demonstrating that the class is maintainable pursuant to Rule 23(b).  *Narouz v. Charter Commc'ns, LLC,* 591 F.3d 1261, 1266 (9th Cir. 2010).  In this case, Plaintiff seeks certification of both Classes under Rule 23(b)(2) and Rule 23(b)(3). Rules 23(b)(2) and 23(b)(3) are satisfied if:

> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class; or

> (3) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b).

Rule 23 is more than a pleading standard.  "A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 131 S.Ct., at 2552 (emphasis in original). "[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable." *General Telephone Co. Of Southwest v. Falcon*, 457 U.S. 147, 160 (1982).

When considering a motion for class certification, the Court must conduct a "rigorous analysis" to determine "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes,* 131 S.Ct. at 2551-2; *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 980 (9th Cir. 2011).   Frequently "that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Ellis,* 657 F.3d at 980 (citing *Dukes,* 131 S. Ct. at 2551).  While the court is generally required to accept a Plaintiff's allegations as true, *Blackie v. Barrack*, 524 F.2d 891, 901, n.17 (9th Cir. 1975), a court is not required to "unquestioningly accept a plaintiff's arguments as to the necessary Rule 23 determinations." *Campion v. Old Republic Home Protection Co., Inc.*, 272 F.R.D. 517, 525 (S.D. Cal. 2011) (internal citation omitted).  In fact, the Court *must* probe behind the pleadings if doing so is necessary to make findings on the Rule 23 certification decision. *Ellis,* 657 F.3d at 981.

### 2.      Numerosity

Rule 23(a)(1) requires the members of a proposed class to be so numerous that joinder of all of the class members would be impracticable. Fed. R. Civ. P. 23(a). "Impracticability does not mean 'impossibility,' but only the difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 913–14 (9th Cir.1964) (quoting *Advertising Specialty Nat. Ass'n v. FTC*, 238 F.2d 108, 119 (1st Cir.1956)). Additionally, the exact size of the class need not be known so long as "general knowledge and common sense indicate that it is large." *Perez-Funez v. Dist. Dir.,* 611 F. Supp. 990, 995 (C.D. Cal. 1984).

The evidence shows that Comcast currently claims to have 2.1 million customers within the State of California. (Ruf Decl., Ex 14 at 189-190, Doc. 66.)   In an effort to establish numerosity of the Classes, Plaintiffs have proffered a Comcast record which categorizes various Comcast customer

14

complaints relating to their Comcast accounts.  (Ruf Decl., Ex 15, Doc. 66.)  While this evidence does align with some of the allegations in Plaintiffs' FAC, the Classes Plaintiffs seek to certify relate entirely to Comcast consumers who sought to terminate their accounts.  None of the information conveyed in Plaintiffs' Exhibit 15 specifically relates to Comcast consumers who sought to terminate their accounts.  As such, Plaintiff's Exhibit 15 does little to aid the Court in its numerosity analysis.

It seems self-evident, however, that the proposed Classes are sufficiently numerous. Considering Comcast has millions of customers in California alone, it is reasonable to infer that many may have, in the last five years, cancelled their Comcast service. Comcast has not provided any meaningful objection to the numerosity requirement.  While Plaintiffs probably could have obtained information relating to the number of former Comcast consumers who have terminated their Comcast accounts in the relevant class period - thus providing a more accurate picture of the relative class size - the Court will infer that the proposed Classes are sufficiently numerous to meet the relatively low threshold required under Rule 23(a)(1).  *See Philadelphia Electric Co. V. Anaconda Am. Brass Co.,* 43 F.R.D. 452, 463 (E.D. Pa. 1968) (noting that classes of only 25 members are sufficiently large enough to justify certification); *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610, 617 (C.D. Cal. 2008) ("[a]s a general rule, classes of forty or more are considered sufficiently numerous.")  Accordingly, the proposed Classes are so numerous that joinder is impracticable and the numerosity requirement is met.

### 3.    Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class."  Historically, the requirements of Rule 23(a)(2) have "been construed permissively," and "[a]ll questions of fact and law need not be common to satisfy the rule."  *Hanlon,* 150 F.3d at 1019.  Indeed, "[e]ven a single [common] question" will satisfy the Rule 23(a)(2) inquiry.  *Dukes,* 131 S. Ct at 2556 (internal citation omitted).

The Supreme Court's recent decision in *Dukes,* however, has undoubtedly increased the burden on class representatives by requiring that they identify *how* common points of facts and law will drive or resolve the litigation. *Dukes,* 131 S. Ct at 2552 ("What matters to class certification ...

1   is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide

2   proceeding to generate common answers apt to drive the resolution of the litigation.") (internal

3   citations omitted.) Under this standard, it is insufficient to merely allege any common question, for

4   example, "did Defendant's conduct violate the UCL or CLRA?" *See Ellis v. Costco,* 657 F.3d at

5   981*; Dukes,* 131 S.Ct. at 2551-52.

6        Plaintiffs argue that "common facts and questions of law abound[,]" because this case is

7   based on standardized billing practices, service contracts and porting policies.  (Pls.' Mot. Class

8   Cert., 11: 1-11, Doc. 65.) Plaintiffs argue that the common questions which "form the core" of the

9   Court's analysis, found in Plaintiffs' FAC and Motion, are:

10         a.    Whether, by the misconduct set forth in this FAC, Defendant has engaged in
11              unfair, fraudulent or unlawful business practices with respect to the refunding,
           cancellation, disconnection, porting confirmation, and/or termination of
12              Comcast services;

13         b.    Whether Defendant violated the Consumer Legal Remedies Act;

14
      c.    Whether Defendant breached their Service Contract and Recurring Payment
15              Contract with consumers by charging them additional fees; and

16
      d.    Whether, as a result of Defendant's misconduct as alleged herein, Plaintiffs
17              and the Classes are entitled to damages, injunctive relief and other remedies to which
           Class Members are entitled as a result of Defendant's wrongful conduct, and, if so,
18              the amount and nature of such relief.

19   (FAC ¶35, Doc. 56; Pls.' Mot. Class Cert., 16: 16-26, Doc. 65.)

20        Comcast argues that Plaintiffs have failed to meet the commonality requirement because

21   Plaintiffs' common questions "merely repeat the Complaint's three counts and its prayer for relief."

22   (Comcast's Op., 11: 14-17, Doc. 75.)  Comcast cites *Dukes* in arguing that the court should "require

23   plaintiffs to articulate not just <u>common questions</u>, but to show that there are <u>'common answers'</u> to

24   the issues that will 'drive the resolution of the litigation' for the proposed class as a whole."

25   (Comcast's Op. 12: 1-3, Doc. 75.) (Emphasis in original.)  Comcast additionally argues that, because

26   the primary issues driving this litigation are (1) whether each customer is entitled to a refund, and (2)

27   whether there is a common answer regarding causation for the Cancellation Class's claims - issues

28

1    that, in Comcast's opinion, can not be resolved on a class-wide basis - commonality can not be met.[17]

2    (Comcast's Op. 13: 1-8, Doc. 75.)

3           The Court agrees with Comcast.  Plaintiffs' FAC and moving papers fail to properly

4    articulate common issues of fact and law capable of generating common answers to issues that will

5    drive resolution of this litigation.  In *Dukes*, the Court presented the following hypothetical

6    "common" questions as <u>in</u>adequate to meet the requirement of Rule 23(a)(2):

7           "Do all of us plaintiffs indeed work for Wal–Mart? Do our managers have discretion
            over pay? Is that an unlawful employment practice? What remedies should we get?
8           Reciting these questions is not sufficient to obtain class certification."

9    *Dukes,* 131 S.Ct. at 2551.  These hypothetical common questions, while insufficient, nonetheless

10   sought to answer specific, discrete factual queries that ultimately failed to "resolve an issue that is

11   central to the validity of each one of the claims in one stroke."  *Dukes*, at 131 S.Ct. at 2551.  The

12   common questions presented in Plaintiffs' FAC fall short of the hypothetically inadequate ones

13   presented in *Dukes.*  Plaintiffs' common questions fail to provoke a single specific, common factual

14   inquiry.  Instead, Plaintiffs' common questions do little more than rephrase Plaintiffs' causes of

15   action and request for relief in the question form.

16          Despite Plaintiffs' failure to adequately articulate common questions, it is appropriate for the

17   Court to look to the arguments of the parties and the evidence before the Court in determining

18   whether such common questions exist.  *See Dukes,* 131 S.Ct. 2551-3 (evaluating whether the

19   plaintiffs claims "depend[ed] on a common contention"); *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582,

20   589 (C.D. Cal. 2011) (finding Plaintiff has established commonality by evaluating the pleadings and

21   contentions as a whole, rather than looking to specifically articulated questions regarding the issue of

22   commonality)

23

24

25

26   [17] The Court agrees with Comcast on both of these points, however, this argument does not defeat the Rule 23(a)(2) analysis.  The goal of the 23(a)(2) analysis is not to identify the *primary* issues related to class certification, but rather, to

27   merely identify *some* common questions of fact or law, the common answers to which will drive the resolution of the litigation for the proposed class as a whole. *Dukes,*131 S. Ct at 2552  It is not necessary, under Rule 23(a)(2), to demonstrate the

28   *predominant* issues with respect to the Class are indeed common issues.  In other words, Comcast's position is more appropriately considered under the Rule 23(b)(3) analysis, which specifically endeavors to identify the predominate issues.

### i.      Common Questions Specific to the Cancellation Class

Plaintiffs' Cancellation Class claims do not present a single common question capable of generating common answers apt to drive the resolution of this litigation. The only common fact referenced by Plaintiffs is that Comcast utilizes "only one billing system and one billing format[.]" (Pls.' Mot. Class Cert., 10: 27-7, Doc. 65.)  Based on Comcast's common billing system, Plaintiffs argue, common questions are present as to whether Comcast's billing statements are "unclear" within the meaning of the Video Act, and additionally, whether Comcast's billing statements are accurate with respect to final billing and refund calculations.

### a.      Unclear Billing Statements

The clarity, or lack thereof, of Comcast's billing statements do not present a common question to the Class.  Such a question requires a highly subjective and individualized inquiry which would invariably differ from one Comcast customer to another, depending on factors such as knowledge, experience, intuitiveness, etc.  *See In re Paxil Litigation,* F.R.D. 539, 541-42 (C.D. Cal. 2003) (the plaintiff sought to certify a class of persons who suffered "severe" withdrawal symptoms after discontinuing use of the prescription drug Paxil. The Court found that the term "severe" was inherently subjective, thus failing to create a common issue.) What may be "unclear" to one Comcast customer may be perfectly clear to another, and vica versa.  The Video Act does not require Comcast to construct or otherwise present their billing statements in a certain way in order to be viewed as clear or understandable.  Furthermore, Plaintiffs have not explained how these billing statements should be constructed in order to be understandable from the perspective of a reasonable or average Comcast customer.[18]  Without some objective measure of clarity, the Court is without any means to adjudicate this issue on a class-wide basis.

### b.      Inaccurate Billing Statements

Plaintiffs argue the "systematic" and "rampant inaccuracies" in Comcast's billing statements create a common question suitable for class-wide determination. This too, however, is not a question capable of generating common answers.  Indeed, at the November 18 hearing, counsel for Plaintiffs

---

[18] Even if Plaintiff had undertaken this effort, it is unlikely the Court would be inclined to interpose Plaintiffs' subjective opinions regarding billing statement clarity into Comcast's billing practices.

acknowledged that there is, at present, no common means for determining whether putative Class members were in fact overcharged or received an inadequate refund on a common basis.  Plaintiffs maintain that such information exists, and that a common means for ascertaining this information is possible, but Plaintiffs have nonetheless failed to identify or otherwise articulate how the inaccuracies of Comcast's billing statements can be demonstrated on a class-wide basis  *See Stern v. AT&T Mobility Corp.,* No. 05-cv-8842-CAS (CTX), 2008 WL 4382796 (C.D. Cal., Aug. 22, 2008) ("there is presently no evidence from which it can be determined on a class-wide basis what services were selected and what services were provided.  While such evidence may be available, it has yet to be provided.  Accordingly, the Court finds that plaintiff has at this juncture failed to meet her burden to establish a plausible class-wide method to prove [liability].") Like Plaintiffs' inability to plead a concrete injury in fact relating to inadequate refunds, Plaintiffs have failed to pose a common question to ascertain the accuracy of billing statements and refund calculations capable of generating common answers.

### ii.        Common Questions Specific to the Porting Class

Plaintiffs argue a question common to the Porting Class relates to Comcast's practice of leaving accounts open past the agreed-upon termination date.  The Court agrees with Plaintiffs that this issue presents a common question capable of resulting in common answers driving this litigation. The evidence indicates Comcast employs a standardized practice of leaving customer accounts open until porting is confirmed.  The evidence further indicates that Comcast continues to bill its customers while their accounts remain open.  Determining whether these common practices violate the terms of Comcast's Service Agreement or violate the UCL or CLRA is central to the validity of each one of the claims in one stroke.  This single common question alone is sufficient to meet the requirements of Rule 23(a)(2) with respect to the Porting Class. *Dukes,* 131 S.Ct. at 2553. Nonetheless, as explained below, this common question to the Porting Class fails to establish an injury in fact.

### iii.       Common Questions Relating to Injury In Fact on Behalf of Both Classes

Plaintiff argues commonality exists for the type of injuries sustained by the Classes. The only two injuries arguably before the Court are inadequate refunds and bank-imposed overdraft fees.

### a.    Inadequate Refunds

Whether putative Class members have suffered an injury in fact resulting from an inadequate refund is not a question capable of generating common answers for the Classes as a whole. Discussed above, *supra* Section IV.A.3.i, Plaintiffs have failed to identify a single non-speculative basis for asserting inadequate refunds on behalf of the Classes.  The evidence before the Court indicates that none of the members for either Class have suffered an inadequate refund injury.  Even if Plaintiffs had demonstrated an inadequate refund injury in their own right, the evidence currently before the court demonstrates a highly individualized inquiry would be required to determine whether each and every Class member had suffered an inadequate refund injury.

### b.    Overdraft Injuries

Whether putative Class members have suffered an injury in the form of bank-imposed overdraft fees resulting from an improper debit on a Comcast customer account is not a question capable of generating common answers for the Classes as a whole.  Plaintiffs have not presented any argument or evidence indicating a common means for ascertaining the answer to this question and, moreover, an individualized inquiry would be required to determine if a customer lacked sufficient funds in their bank account to cover a Comcast debit.

### 4.    Typicality

Rule 23(a)(3) requires the claims or defenses of the representative parties be typical of the claims or defenses of the class.  Rule 23(a)(3)'s typicality requirement provides that a "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Keilholtz,* 268 F.R.D. at 337 (quotation omitted). The purpose of Rule 23(a)(3) is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992). The requirement is satisfied where the named plaintiffs have the same or similar injury as the unnamed class members, the action is based on conduct which is not unique to the named plaintiffs, and other class members have been injured by the same course of conduct. *Id.*

Plaintiffs argue that typicality is met because, *inter alia,* Plaintiffs cancelled their Comcast

services, returned their Comcast equipment, received "convoluted and inaccurate" billing statements and continued to be charged after cancellation due to a "porting confirmation." (Pls. Mot. Class Cert., 12: 9-21, Doc. 65.) Comcast responds that Plaintiff's claims are not typical because Plaintiffs received a complete refund and, as such, Plaintiffs claims are subject to unique defenses, thus defeating typicality.[19] Comcast additionally argues that Plaintiffs are non-typical of the proposed Classes' claims regarding confusing and misleading billing statements because "Plaintiffs understood their bills well enough to call and protest those charges that were refunded." (Comcast's Op., 10: 23-6, Doc. 75.) Plaintiffs respond that there is no supporting evidence regarding a complete refund from Comcast and furthermore, Plaintiffs' scrutinizing of their billing statements was the result of a large overcharge, not that they understood the billing statements better than the average class member. [20] (Pls. Reply, 7: 2-10, Doc. 78.)

The parties are in disagreement as to whether Comcast has a policy "automatically" generating refunds. Plaintiffs have argued that there is "ZERO" evidence of such automatic refunds.(Pls.' Reply, 1: 17-19, Doc. 78.) Comcast, on the other hand, has cited to various portions of the evidence in asserting that refunds are generated automatically. (Merryman Decl., Ex. A at 11; Ex. Q at 141-44; Ex. T at 196-201; Doc. 75.)

In *Hanon*, the Ninth Circuit stated that "a named plaintiff's motion for class certification should not be granted if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon*, 976 F.2d at 508. There, the Ninth Circuit found that the named plaintiff did not satisfy Rule 23(a)'s typicality requirement because his "unique background and factual situation require[d] him to prepare to meet defenses that [we]re not

---

[19] This argument is inconsistent with Comcast's overall position. The majority of Comcast's briefing attempts to make the point that refunds are automatically generated and, as such, both the named plaintiffs and putative class members would not have any damages. As such, the refund to Plaintiffs, from Comcast's perspective, would not create a unique defense.

[20] The Court does not accept Comcast's argument that Plaintiffs claims relating to "misleading billing statements" are atypical because they had the wherewithal to call and protest Comcast's continued billing. The evidence shows that these calls related to Comcast's continuing monthly debits after the cancellation date, rather than the clarity of Comcast's refund calculation. Furthermore, the evidence demonstrates Plaintiffs did not, and presently do not, understand the breakdown of Comcast's refund calculation.

typical of the defenses which may be raised against other members of the proposed class." *Id.; See also, Ellis,* 657 F.R.D. at 984 (holding that a district court applied the incorrect standard of decision when holding that "as a generalized matter, individualized defenses do not defeat typicality.")

The Court is persuaded by the evidence at hand that Comcast does in fact have internal mechanisms for automatically generating refunds. As such, Plaintiffs' claims, i.e, that the refunds provided by Comcast are inadequate, are typical of claims that may be asserted by other putative class members.

### 5.    Adequacy of Representation

Rule 23 requires that a class be certified only if "representative parties will fairly and adequately protect the interests of the class." This factor requires that (1) the proposed representatives do not have conflicts of interest with the proposed class, and (2) that the representatives and their counsel will vigorously prosecute the action on behalf of the class. *Hanlon,* 159, F.3d at 120.

Comcast does not challenge the adequacy of Plaintiffs' counsel, and there is nothing before the Court indicating Plaintiffs' counsel would not vigorously prosecute the action on behalf of the Classes. Comcast's only challenge to this aspect of Rule 23 is that Plaintiffs are not adequate representatives because they lack standing to bring their own claims. (Comcast's Op., 11: 7-10, Doc. 75.) The Court, however, has determined Plaintiffs have properly stated an injury in fact resulting from bank overdraft fees. While this type of injury does not present a common question for the Classes, it nonetheless confers standing for Plaintiffs individual claims. As such, Comcast's argument that Plaintiffs are inadequate representatives because they lack individual standing is rejected. Additionally, there is nothing in the record to suggest that Plaintiffs have any interests antagonistic to the Classes, or that Plaintiffs have not, or would not continue to vigorously prosecute the actions on behalf of the Classes. As such, the Court finds the adequacy of representation requirement satisfied.

### C.    Rule 23(b)(2) Analysis

Plaintiff's Notice of Motion and Motion for Class Certification only seek certification under

Rule 23(b)(3), however, Plaintiff's Points and Authorities and arguments presented at the November 18 hearing also argue for certification pursuant to Rule 23(b)(2).  Under Rule 23(b)(2), a class action may be maintained if the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  Fed. R. Civ. P. 23(b)(2).

Plaintiffs contend that because Comcast has engaged in practices which "appl[y] across the board to all members of each Class"- practices which include all Cancellation Class members receiving the same inaccurate and confusing billing statements and Comcast's failure to comply with the termination provisions in its Service Contract - injunctive relief is necessary to eliminate these deceptive practices.  (Pls. Mot. 14: 25-8, 15: 1-8, Doc. 65.)  Comcast responds that certification under Rule 23(b)(2) is inappropriate because (1) the acts complained of have ceased, as Comcast has created new billing statements which cure the deficiencies alleged by Plaintiffs (Op. 16: 20-21, Doc. 75), (2) the members of both Classes, by definition, have cancelled their Comcast services and, as such, lack standing to seek injunctive relief (Op. 17: 3-13, Doc. 75),  (3)  Plaintiff's claims for injunctive relief are secondary to Plaintiff's claims for monetary relief (Op. 17: 14-22, Doc. 75), and (4) Plaintiffs' monetary claims require an individualized determination, which is prohibited under a Rule 23(b)(2) certification.  *Id.*  The Court addresses each of these arguments in turn.

**1.      Whether Comcast's New Billing Statements Prevent 23(b)(2) Certification**

Comcast claims its new final bills, which include a termination date, have mooted Plaintiff's request for injunctive relief.  Plaintiffs respond that the lack of termination date was just one of several problems alleged in Comcast's billing statements, and further, Comcast has not changed its policy with respect to leaving customer accounts open for "porting confirmation."  (Pls.' Reply 9: 1-9, Doc. 78.)

The Court agrees with Plaintiffs. With respect to the Porting Class, Comcast's new final bills have no bearing on the Porting Class's claims.  The Porting Class's claims relate to internal procedures for leaving open accounts after an agreed-upon termination date in order to confirm that porting has occurred.  The revised statements have nothing to do with the Porting Class.  With respect to the Cancellation Class, Plaintiffs challenge more than just the lack of termination date.

23

1   Plaintiffs also allege that the bills are confusing to the point of being incomprehendable. Comcast

2   does not claim they have taken measures to cure all these perceived problems, and there is nothing in

3   the record to suggest such alterations were made.  As such, Comcast's new billing statements do not

4   moot Plaintiff's request for injunctive relief.

5        **2.      Putative Class Members Lack Standing As They Are No Longer Comcast**

6              **Customers**

7        Comcast argues that 23(b)(2) certification is not proper because all putative class members

8   for both Classes are, by definition, former Comcast customers and, as such, lack standing to seek

9   injunctive relief relating to Comcast's billing statements or termination policies. (Op. 17: 3-12, Doc.

10  75.)  In response, Plaintiffs argue that "even subscribers who have cancelled Comcast services may

11  again be at risk for this unlawful behavior should they return as Comcast customers" and

12  "[m]oreover, all current Comcast customers (including Plaintiffs) who may cancel in the future are at

13  risk should the Court decline to grant injunctive relief." (Pls.' Reply, 9: 10-13, Doc. 78.)

14       The Court agrees with Comcast. *Dukes* presented a similar standing question which is largely

15  dispositive of this inquiry.  In *Dukes,* roughly half of the members of the proposed class were former

16  employees of WalMart who sought injunctive relief against WalMart's current employment

17  practices.  *Dukes,* 131 S. Ct. at 2559-60.  Citing the general principle that certification under Rule

18  23(b)(2) is appropriate when "final injunctive relief or corresponding declaratory relief is appropriate

19  respecting the class *as a whole*" (emphasis added), *Dukes* found that "about half of the members of

20  the class . . . have no claim for injunctive or declaratory relief at all." *Id.* at 260.

21       Here, based on the proposed class definitions, the vast majority of class members would have

22  no claim for injunctive relief, because they are, by definition, *former* Comcast subscribers.  The only

23  class members who would have a claim for injunctive relief are those that are identical to Plaintiff,

24  i.e., cancelled and then re-subscribed to Comcast's services.  But this would appear to be a tiny

25  fraction of the proposed classes, and there is nothing in the evidence to suggest otherwise.

26       The Court is not persuaded by Plaintiffs' argument that former Comcast customers *may*

27  someday become Comcast customers again, and eventually need relief from Comcast's current

28  practices.  Such an attenuated interest in the requested injunctive relief is entirely too speculative to

confer any legitimate interest in injunctive relief. *See Whitmore,* 495 U.S. at 155-56.   Additionally, the Court is equally unpersuaded by Plaintiffs' argument that current Comcast customers require the requested relief, because both Classes are defined to include only *former* Comcast customers.  As such, the vast majority of current Comcast customers, nor their interests, are proposed to be represented Plaintiffs.

### 3. Plaintiffs Claims For Monetary Relief Are Not Incidental To Plaintiffs Claims For Injunctive Relief

Comcast argues that Plaintiffs' Classes can not be certified under Rule 23(b)(2) because "this case is <u>solely</u> about monetary relief." (Op., 17: 15-17, Doc. 75) (Emphasis in original.)  In *Dukes,* the Supreme Court revisited the issue of whether claims for monetary relief could be made under Rule 23(b)(2).  *Dukes* concluded that such monetary claims "may not [be certified under Rule 23(b)(2)], at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief." *Dukes,* 131 S. Ct. at 2557.   In establishing the framework for this analysis, the Supreme Court cited, with approval, the Fifth Circuit's decision in *Allison v. Citgo Petroleum Corp.,* 151 F. 3d 402, 415 (5th Cir. 1998).  *Allison* found that Rule 23(b)(2) allows for the certification of monetary relief that is "incidental to [the] requested injunctive relief," which *Allison* defined as "damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." *Id.*  In *Allison's* view, such "incidental damage should not require additional hearings to resolve the disparate merits of each individuals case; it should neither introduce new substantial legal or factual issues, nor entail complex individualized determinations." *Ibid.*

Under this standard, Plaintiffs' Classes can not be certified under Rule 23(b)(2) for two reasons.  First, the putative Class members (i.e., former Comcast customers)  have no interest in the requested injunctive relief (i.e., relief from Comcast's practices relating to its current customers).  The monetary claims are indeed the only claims at issue.  Second, the damages involved in this case do not flow directly from liability to the class as a whole.  On the contrary, questions of liability and damages are wholly intertwined, both of which requiring the same individualized analysis.  Therefore, Plaintiffs' claims for monetary relief are not incidental to Plaintiffs' claims for injunctive relief.

**4.      Rule 23(b)(2) Certification Is Improper As Individualized Determinations of**

**Damages Are Required**

Plaintiffs' monetary claims can not be certified under Rule 23(b)(2) because an individualized determination of damages is required.  In *Dukes*, the Supreme Court, while expressing serious doubt as to whether claims for monetary relief could ever be certified under Rule 23(b)(2), clarified the circumstances in which a Rule 23(b)(2) class certification is appropriate:

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." (Citation) In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant. *Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.*

(Internal citations omitted) (emphasis added). Similarly, in *Ellis*, the Ninth Circuit, applying the new standard enunciated in *Dukes*, clarified that under *Dukes,* the primary objective in the Rule 23(b)(2) analysis regarding claims for injunctive relief and monetary damages is whether monetary relief could be granted absent "individualized determinations."  *Ellis,* 657 F.3d at 987.  Here, even if there were currently a means for determining damages on a common class-wide basis, the individual class member's damages would differ from one another.   As such, individual class member's damages will necessarily require "individualized determinations."

Based on the above analysis, class certification under Rule 23(b)(2) is denied.  The majority of Plaintiffs' proposed class members would lack standing to assert claims for injunctive relief. Furthermore, Plaintiffs' claims for monetary relief are not incidental to Plaintiffs' claims for injunctive relief, and Plaintiffs' claims for monetary relief would require individualized determinations.  Accordingly, certification of Plaintiff's monetary and injunctive claims under Rule 23(b)(2) is not appropriate.

**D.      Rule 23(b)(3) Analysis**

To certify a class under Rule 23(b)(3), Plaintiff must demonstrate: 1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" ("Predominance") and 2) a class action is "superior to other available methods for the fair

1   and efficient adjudication of the controversy." ("Superiority"); Fed. R. Civ. P. 23(b)(3).

2       **1.   Predominance**

3       When evaluating damages in the predominance inquiry, "[t]he *amount* of damages is

4   invariably an individual question and does not defeat class action treatment." *Blackie v. Barrack,* 524

5   F.2d 891, 905 (9th cir. 1975) (emphasis added); *see also Negrete v. Allianz Life Ins. Co. of North*

6   *America,* 238 F.R.D. 482 (C.D. Cal. 2002).  While determining the *amount* of damages does not

7   defeat the predominance inquiry, a proposed class action requiring the court to determine

8   individualized *fact* of damages does not meet the predominance standards of Rule 23(b)(3).  *See In*

9   *re Live Antitrust Litigation,* 247 F.R.D. 98 (C.D. Cal. 2007) (recognizing the distinction between

10  demonstrating the fact of damages and the amount of damages, and determining that while the latter

11  does not preclude class certification, the former does.); *Catlin v. Washington Energy Co.,* 791 F.2d

12  1343, 1350 (9th Cir.1986) ("[T]he requirement that plaintiff prove 'both the fact of damage and the

13  amount of damage ... are two separate proofs.'") (internal citation omitted.)

14      While the Ninth Circuit does not appear to have addressed this precise issue, it is generally

15  accepted that classes should not be certified where "not every member of the proposed classes can

16  prove with common evidence that they suffered impact."  *Blades v. Monsanto Co.,* 400 F.3d 562, 571

17  (8th Cir. 2005); *Bell v. Atlantic Corp., v. AT&T Corp.,* 339 F.3d 294, 302-03 (5th Cir. 2003) ("where

18  fact of damage cannot be established for every class member through proof common to the class, the

19  need to establish antitrust liability for individual class members defeats Rule 23(b)(3)

20  predominance"); *Newton v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 259 F.3d 154, 189 (3d Cir.

21  2001); *In re Live Antitrust Litigation,* 247 F.R.D. 98 (C.D. Cal. 2007) (citing the above-referenced

22  cases and adopting their reasoning).  Federal courts in California have often refer to this "fact of

23  damage" inquiry as an evaluation of putative class members Article III standing.  *See, e.g., Burdick v.*

24  *Union Sec. Ins. Co.,* 2009 WL 4798873, *3 (C.D. Cal. Dec. 9, 2009) (there must be a common means

25  for asserting injuries in fact for all class members, i.e., there must be for Class members to assert

26  Article III standing); *Webb v. Carter's Inc.,* 272 F.R.D. 489 (C.D. Cal. 2011) (denying class

27  certification on the ground that absent class members lacked standing because they could not show an

28  injury in fact on a class-wide basis).

One element common to all of Plaintiff's claims, on behalf of both Classes - one which the Court believes is the primary issue in this litigation - is whether the Class members have suffered an injury in fact.  Plaintiffs argue, both at the November 18 hearing and in their moving papers, that the Classes should be certified, with Class issues of damages reserved for the post-certification merits inquiry.  In support of this proposition, Plaintiffs cite *Negrete v. Allianz Life Ins. Co. of North America,* 238 F.R.D. 482, 494 (C.D. Cal. 2002).

The authority cited by Plaintiffs, however, demonstrates that individual damage inquiries do not defeat certification only when plaintiffs have shown "across-the-board" impact.  *Id.* at 493.  In *Negrete,* the court noted that "[w]ith regard to class-wide proof of damages, plaintiffs contend that the annuities were *all* worth less than the purchase prices paid for them . . . ." *Id.* at 492 (emphasis added).  In support of this argument, the *Negrete* plaintiffs offered the testimony of an expert who devised "a methodology to show that all of the [defendants] annuities were worth less than comparable equally safe investments." *Id.*  Ultimately, *Negrete* concluded that "what is important at this stage of the proceedings is that plaintiffs have offered a facially plausible method for showing causation and *impact across-the-board*, so that a class should be certified." *Id.* at 493 (emphasis added).

Plaintiffs have not presented the Court with an evidentiary method for showing causation and across-the-board impact. Indeed, counsel for Plaintiffs acknowledged at the November 18 hearing that no such class-wide method for ascertaining fact of damages presently was available. Furthermore, the evidence before the Court indicates that the Class members have not suffered any injury.  The evidence indicates a myriad of individual inquiries are required to ascertain the fact of damages for each Class member.   For example, some Class members may have executed the Direct Pay authorization such as Plaintiffs, and subsequently lost funds when they were overcharged.  But for those Class members who did not use the Direct Pay program, their accounts were never automatically debited.  Rather, they would merely receive a bill requesting payment. There is no evidence to suggest that these Class members, upon receiving a bill charging them for services past the cancellation date, actually took the affirmative step of tendering over-payments to Comcast.  Even assuming each proposed Class member was overcharged and overpaid, Plaintiffs have not provided a

common means to determine if the refunds provided by Comcast were inadequate.  Just as Plaintiffs can not demonstrate a concrete injury in fact relating to their own claims of inadequate refunds, there is nothing before the Court evidencing the putative class members have suffered an injury in fact as a result of Comcast's conduct.

The damages determination at issue here is not one that merely seeks to identify the amount of damages to each putative class member.   This determination, rather, is one which requires the Court to analyze whether Comcast is liable to each and every putative class member at all.  Such an individualized liability determination predominates over any common issues regarding Comcast's business practices and their relation to the resolution of this lawsuit.  Accordingly, Plaintiffs can not satisfy the Rule 23(b)(3) predominance inquiry for either Class.

**2.      Superiority**

The superiority requirement tests whether "class litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996).  "If each class member has to litigate numerous and substantial separate issues to establish his or hew right to recover individually a class action is not superior" *Zinser,* 253 F.3d at 1192.  Rule 23(b)(3) specifies four nonexclusive factors that are "pertinent" to a determination of whether class certification is the superior method: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).

Assuming the first three factors weigh in favor of class certification, the fourth factor - the difficulties likely to be encountered in the management of a class action - does not.  Because individualized inquiries predominate over common issues regarding Comcast's liability to the putative Classes, *see supra* Section IV.D.1, the difficulties in managing Plaintiffs' claims as a class action are substantial.  The Court finds these manageability issues outweigh any other factor with respect to the superiority analysis.

**E.       Ascertainability**

Both parties have acknowledged that in addition to the express requirements of Rule 23, there is an implied requirement that the proposed classes be ascertainable.  (Pls.' Mot., 8: 22-28, Doc. 65; Comcast's Op., 9: 10-11, Doc. 75.)  "An implied prerequisite to certification is that the class must be sufficiently definite."  *Mazur v. ebay Inc.,* 257 F.R.D. 563 (N.D. Cal. 2009).  A class is not ascertainable when the proposed definition includes individuals who were never injured by the defendant's conduct, *see id.,* or if the proposed definition would require the Court to determine whether a person is a member of the class by evaluating the merits of the individual claims.  *See Rodriguez v. Gates,* 2002 WL 1162675, at *9 (C.D. Cal. May 30, 2002).

Here, Plaintiffs proposed Classes are not ascertainable for two reasons.  First, even assuming there was a common means for determining the adequacy of Comcast's refunds, Plaintiffs' Class definitions are over broad and include Class members who were never injured by Comcast's conduct. For instance, only a portion of Comcast customers utilized Direct Pay, as did Plaintiffs.  The evidence does not suggest that Class members who did not use Direct Pay over-paid.  *See Mazur v. ebay, Inc.,* 257 F.R.D. 563, 567 (N.D. Cal. 2009) (denying class certification on grounds that the class definition was over broad and not ascertainable because it included unharmed individuals); *Colpinto v. Esquire Deposition Servs.,* 09-cv-07584, 2011 WL 913251, at *4 (C.D. Cal., Mar. 8, 2011) (finding no ascertainable class because definition included members who were reimbursed for payments of allegedly unlawful and deceptive charges); *Red v. Kraft Foods, Inc.,* 2011 WL 4599833 (C.D. Cal. 2011) (holding that, based on the proposed class definition, it was doubtful that all members of the proposed class would have Article III standing); *Denny v. Deutsche Bank AG,* 443 F.3d 253, 264 (2nd Cir. 2006); *O'Neill v. Gourmet Sys. Of Minn., Inc.,* 219 F.R.D. 445, 451-52 (W.D. Wis. 2002) (Class definitions must be construed as to exclude individuals would lack standing).  This basis "alone is sufficient to warrant denial of Plaintiffs Motion for Class Certification."  *Colapinto,* 2011 WL 913251 at *4.  While the court has the power to modify the proposed class definitions to make them sufficiently definite, *see Hagen v. City of Winnemucca,* 108 F.R.D. 61, 64 (D. Nev. 1985), this is not an instance in which the court deems such a revision appropriate because, as discussed above, the class certification motion nonetheless fails.

1    Second, Comcast would only be liable to Plaintiffs and the putative Classes upon a finding of

2   injury in fact.  Plaintiffs have failed to identify a common means for establishing injury in fact.

3   Absent a common method of establishing injury, the Court is required to determine the merits of the

4   individual claims to evaluate whether a person is a member of the Class.  Such circumstances prevent

5   certification.  *See Hanni v. Am. Airlines,* No. 08-cv-00732, 2010 WL 28297, at *9 (N.D. Cal. Jan. 15,

6   2010) ("A class definition is inadequate if a court must make a determination of the merits of the

7   individual claims to determine whether a person is a member of the class."); *Rodriguez v. Gates,* 2002

8   WL 1162675 at *9 (C.D. Cal. 2002) (There "is no objective way to determine who is a member of the

9   class proposed by [the plaintiff] without first deciding the merits of each putative class member's

10  claim."); *Brazil v. Dell,* 585 F. Supp. 2d 1158, 1167 (N.D. Cal. 2008) (definition which included

11  persons that "Dell falsely advertised" was not presently ascertainable"). Therefore, the Court finds the

12  two Classes are not ascertainable.

13                          **CONCLUSION AND RECOMMENDATIONS**

14    Having considered the moving, opposition and reply papers, the declarations and exhibits

15  attached thereto, arguments presented at the November 18, 2011 hearing, as well as the Court's file,

16  the Court RECOMMENDS that Plaintiffs' Motion for Class Certification be DENIED.

17    These findings and recommendations are submitted to the district judge assigned to this

18  action, pursuant to Title 28 of the United States Code section 636(b)(1)(B) and this Court's Local

19  Rule 304.  Within fifteen (15) days of service of this recommendation, any party may file written

20  objections to these findings and recommendations with the Court and serve a copy on all parties.

21  Such a document should be captioned "Objections to Magistrate Judge's Findings and

22  Recommendations."  The district judge will review the magistrate judge's findings and

23  recommendations pursuant to Title 28 of the United States Code section 636(b)(1)(C).  The parties

24  are advised that failure to file objections within the specified time may waive the right to appeal the

25  district judge's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

26    IT IS SO ORDERED.

27  **Dated:   January 3, 2012**                    **/s/ Barbara A. McAuliffe**
                                                          UNITED STATES MAGISTRATE JUDGE

28

31